## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JONATHAN RAUL, Derivatively on Behalf of Nominal Defendant ARCONIC INC.,<br><br>                Plaintiff,<br><br>   v.<br><br>JAMES F. ALBAUGH, AMY E. ALVING, CHRISTOPHER L. AYERS, CHARLES BLANKENSHIP, ARTHUR D. COLLINS, JR., ELMER L. DOTY, RAJIV L. GUPTA, DAVID P. HESS, SEAN O. MAHONEY, DAVID J. MILLER, STANLEY O'NEAL, JOHN C. PLANT, ULRICH R. SCHMIDT, KLAUS KLEINFELD, and KEN GIACOBBE<br><br>                Defendants,<br><br>and<br><br>ARCONIC INC.,<br><br>                Nominal Defendant. | Civil Action No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Jonathan Raul ("Plaintiff"), by and through his undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant Arconic Inc. ("Arconic" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Arconic and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on Arconic's website; (c) review of the pleadings and other documents in the securities class action captioned *Howard v. Arconic Inc., et al.*, Case No. 2:17-cv-01057 (W.D. Pa.) (the "Related Securities Action"); and (d) review of other publicly available information concerning Arconic and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant Arconic against certain of the Company's current and former executive officers and directors seeking to remedy the Defendants' violations of the Exchange Act for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately November 4, 2013 to the present (the "Relevant Period").[1]

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately November 4, 2013 to June 23, 2017; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

2.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Arconic knowingly or recklessly supplied its highly flammable Reynobond polyethylene (PE) cladding panels for use in high-rise buildings; (ii) the foregoing conduct significantly increased the risk of property damage, injury and/or death in buildings constructed with Arconic's Reynobond PE panels; and (iii) as a result of the foregoing, Arconic's public statements were materially false and misleading at all relevant times.

3.      On June 14, 2017, a fire began at the 24-story Grenfell Tower apartment block in London.  Burning for approximately 60 hours, the fire destroyed the building, causing at least 71 deaths as well as over 70 injuries.

4.      On June 24, 2017, an article published in *The New York Times* entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," described the causes of the June 14 Grenfell fire, specifically attributing its rapid spread to the highly flammable Reynobond PE cladding panels manufactured by the Company.  The article stated, in pertinent part:

> The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene. It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.
>
> Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes."
>
> *      *      *
>
> Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.

3

\*      \*      \*

> For more than a week after the fire, Arconic declined repeated requests for comment. Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

5.      Also on June 24, 2017, *Reuters* published an article entitled "Arconic knowingly supplied flammable panels for use in tower: emails."  The article revealed that Arconic sales managers were in fact aware that flammable panels would be distributed for use at Grenfell Tower.

6.      On June 26, 2017, the Company issued a press release stating that it would discontinue global sales of Reynobond PE for use in high-rise buildings after the material was suspected to have contributed to the spread of the deadly fire at the Grenfell Tower.

7.      Indeed, a recent investigation conducted by the British Broadcasting Corporation (the "BBC") shows that the Company knew—but failed to disclose to investors—that, as early as 2014, the Reynobond PE products it supplied to high-rise buildings posed a high risk of fire and had failed to meet critical fire safety tests.

8.      Following these disclosures, the Company's common stock price fell $3.70 per share, a drop of over 14%, closing at $21.84 per share, and the Company's preferred stock fell $5.56 per share or 13.9% per share on June 27, 2017.

9.      As a result of Defendants' conduct, the Company has become subjected to the Related Securities Action, as well as the need to undertake internal investigations.

10.      The Company's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company, as a majority of them do not have the requisite level of disinterestedness and independence in light of their conduct, which has subjected the Company to the Related Securities Action.

11.     As a result of Defendants' wrongful acts and omissions, the Company and its shareholders have been substantially damaged.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the claims arise under and pursuant to § 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

13.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

14.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## THE PARTIES

15.     Plaintiff has held shares of the Company during the time of the wrongdoing alleged herein and has held shares of Arconic continuously since that time.

16.     Nominal Defendant Arconic is incorporated in Delaware with its principal executive offices located at 390 Park Avenue, New York, New York 10022.

17.     Defendant James F. Albaugh ("Albaugh") has been a member of the Company's Board since May 2017.  Defendant Albaugh is a member of the Company's Audit Committee.

18.     Defendant Amy E. Alving ("Alving") has been a member of the Company's Board since March 2018.  Previously, Defendant Alving was a member of the Company's Board from November 2016 through approximately May 2017.  Defendant Alving is a member of the Company's Audit Committee.

19.     Defendant Christopher L. Ayers ("Ayers") has been a member of the Company's Board since May 2017.  Defendant Ayers is a member of the Company's Audit Committee and Finance Committee.

20.     Defendant Charles Blankenship ("Blankenship") has been a member of the Company's Board and CEO since January 2018.

21.     Defendant Arthur D. Collins, Jr. ("Collins") has been a member of the Company's Board since 2010.  Defendant Collins is the Chair of the Company's Compensation and Benefits Committee and member of the Governance and Nominating Committee.

22.     Defendant Elmer L. Doty ("Doty") has been a member of the Company's Board since May 2017.  Defendant Doty is a member of the Company's Compensation and Benefits Committee, as well as the Governance and Nominating Committee.

23.     Defendant Rajiv L. Gupta ("Gupta") has been a member of the Company's Board since September 2016.  Defendant Gupta is a member of the Company's Compensation and Benefits Committee, as well as the Governance and Nominating Committee.

24.     Defendants David P. Hess ("Hess") has been a member of the Company's Board since March 2017.  Defendant Hess was the Company's interim CEO from April 2017 to January 2018.  Defendant Hess is a member of the Company's Audit Committee and Finance Committee.

25.     Defendant Sean O. Mahoney ("Mahoney") has been a member of the Company's Board since September 2016.  Defendant Mahoney is the Chair of the Company's Finance Committee and a member of the Audit Committee.

26.     Defendant David J. Miller ("Miller") has been a member of the Company's Board since December 2017.  Defendant Miller is a member of the Company's Finance Committee.

27.     Defendant E. Stanley O'Neal ("O'Neal") has been a member of the Company's Board since January 2008.  Defendant O'Neal is a member of the Company's Audit Committee and Finance Committee.

28.     Defendant John C. Plant ("Plant") has been a member of the Company's Board since September 2016 and has been Chairman since October 2017.  Defendant Plant is a member of the Company's Compensation and Benefits Committee, as well as the Governance and Nominating Committee.

29.     Defendant Ulrich R. Schmidt ("Schmidt") has been a member of the Company's Board since September 2016.  Defendant Schmidt is the Chair of the Company's Audit Committee and member of the Finance Committee.

30.     Defendants Albaugh, Alving, Ayers, Blankenship, Collins Doty, Gupta, Hess, Mahoney, Miller, O'Neal, Plant, and Schmidt are collectively referred to herein as the "Director Defendants."

31.     Defendant Klaus Kleinfeld ("Kleinfeld") was the Company's CEO from May 8, 2008 until he was asked to resign on April 17, 2017, after displaying flagrant behavior toward one of the Company's largest shareholders. Kleinfeld was elected to Alcoa's Board of Directors in November 2003 and became Chairman on April 23, 2010. He was President and Chief Operating Officer of Alcoa from October 1, 2007 to May 8, 2008.

32.     Defendant Ken Giacobbe ("Giacobbe") is the Company's Chief Financial Officer, a role he has held since 2016.

33.     Defendants Blankenship, Kleinfeld, and Giacobbe are referred to collectively herein as the "Officer Defendants."

34.     The Officer Defendants, along with the Director Defendants, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

35.     Founded in 1888, the Company's predecessor, Alcoa, Inc., was the world's fifth largest producer of aluminum. On November 1, 2016, Alcoa spun-off its Alumina and Primary Metals segments, the rolling mill at the Warrick, Indiana, operations and a 25.1% stake in the Ma'aden Rolling Company in Saudi Arabia into a new separately-held company, Alcoa Corporation. The predecessor company changed its name to Arconic. All references in this Complaint to Arconic include its predecessor company.

36.     Before the Spin-Off, the Company's operations consisted of four worldwide reportable segments: (i) Alumina, (ii) Primary Metals, (iii) Global Rolled Products, and (iv) Engineered Products and Solutions (which included aluminum). Post Spin-Off, Arconic has continued to engage in lightweight metals engineering and manufacturing. Arconic's multi-material products, which include aluminum, titanium, and nickel, are used worldwide in aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial applications. Arconic's operations now consist of three worldwide reportable segments: (i) Global Rolled Products, (ii) Engineered Products and Solutions, and (iii) Transportation and Construction Solutions.

37.     Reynobond Aluminum Composite Material ("ACM") is a wall cladding product sold by Arconic that consists of two sheets of thin aluminum, each permanently bonded to an extruded thermoplastic core.  The ACM panels are combined with insulation to form cladding used to cover residential and office towers and other buildings. Reynobond is sold with either a Polyethylene

8

("PE") core, which is combustible, or a more expensive Fire Resistant ("FR") core. The Polyethylene core product, Reynobond PE, the cheaper of the two products, was the one Arconic's sales personnel pushed to customers, particularly when engaged in competitive bidding, in order to win projects.

38.     At all relevant times, Arconic was a leading producer of aluminum products. The Company represented that aluminum and alumina constituted approximately 80% of Alcoa's revenues.  In November 2016, Arconic's upstream business segments separated to become a stand-alone company, and in 2016, Arconic operated in 19 countries. Based upon the country where the point of sale occurred, the U.S. and Europe generated 51% and 26%, respectively, of Arconic's sales in 2013; 51% and 27%, respectively, of Arconic's sales in 2014; 51% and 26%, respectively, of Arconic's sales in 2015; and 63% and 26%, respectively, of Arconic's sales in 2016.

39.     In filings with the SEC, Arconic acknowledged that it was subject to highly competitive conditions in all aspects of its aluminum businesses, with competition from both U.S. and non-U.S. companies in all major markets.  Arconic's brand names faced brand recognition, with brand loyalty also playing an important competitive role.

**The Grenfell Tower Fire**

40.     On June 14, 2017, a fire engulfed Grenfell Tower, a 24-story, 220-foot (67 meter) high tower block of public housing flats in North Kensington, west London, in the United Kingdom.

41.     The Grenfell Tower contained flammable cladding supplied by Arconic. That cladding fueled the inferno that eradicated the Grenfell Tower.  Approximately 3,125 square meters of PE panels were used to coat the tower.

42.     The Grenfell Tower fire is the deadliest in the U.K. for more than a century. The inferno resulted in at least 71 fatalities and over 70 injuries.  The tower contained 127 flats, with 227

bedrooms, at the time of the fire.  The fire started in a fourth-floor flat.  The speed at which the fire spread accelerated as a result of the building's exterior cladding. Flames consumed the tower quickly. People trapped on the higher floors screamed for their lives through broken windows. Flames in an ordinary fire burst out of windows, moving from the inside out.  Grenfell Tower burned in reverse, moving inward from the building's exterior.  The flames quickly tore upward in streaks through the facade, filling apartments with toxic black smoke.  Torrents of orange and red branched out of the first streaks and shot upward.  The flames encased the building in a cylinder of fire.  More than 200 firefighters battled the blaze. They brought 40 fire engines and other vehicles.

43.     The Grenfell Tower was managed on behalf of the borough council by Kensington and Chelsea Tenant Management Organisation ("KCTMO"), the largest tenant management organization ("TMO") in England, which is responsible for the management of nearly 10,000 properties in the borough. The KCTMO has a board comprising of eight residents (tenants or leaseholders), four council-appointed members, and three independent members.

44.     Grenfell Tower had undergone a major renovation, which was completed in 2016. Plans for the renovation were publicized in 2012. The £8.7 million renovation was overseen by Studio E Architects, Rydon Ltd. of Forest Row, East Sussex, in conjunction with Artelia for contract administration and Max Fordham as specialist mechanical and electrical consultants.  As part of the project, in 2015–2016, the concrete structure received new windows and new aluminum composite rainscreen cladding supplied by Arconic, in part to improve the appearance of the building. Two types were used: Arconic's Reynobond and Reynolux aluminum sheets. Beneath these and fixed to the outside of the walls of the flats was Celotex RS5000 PIR thermal insulation. Arconic sold its ACM panels to Worcester-based Omnis Exteriors, which acted as the "fabricator," cutting the panels into shape and supplying them to the contractors working on the Grenfell Tower. The cladding

installation work was carried out by Harley Facades of Crowborough, East Sussex, at a cost of £2.6 million.

45.    The original contractor, Leadbitter, had been dropped by KCTMO because its price of £11.278 million was £1.6 million higher than the proposed budget for the refurbishment. The contract was put out to competitive bidding. Rydon's bid was £2.5 million less than Leadbitter's. Rydon's bid called for the installation of Reynobond PE rather than Reynobond FR, despite that Grenfell Tower is 67 meters tall and despite the fact that Arconic's own marketing literature states it should not be used on buildings higher than 10 meters, due to its lack of fire retardant.

46.    Initial building plans for Grenfell Tower approved by residents in 2012 specified zinc cladding. Documents from June and July of 2014 show that KCTMO pressured the project manager for the refurbishing of Grenfell Tower to cut costs. Specifically, KCTMO emailed the manager that "we need good costs" for a meeting to be held the next morning with the project planner. The email suggested several cost-reduction measures. One was to swap the panels of zinc cladding, which were non-combustible and had a fire-retardant mineral core, with panels of combustible and flammable aluminum with a polyethylene core. The email said that this substitution would yield "a saving of £293,368."

47.    In the same time-period, between May and July of 2014, Deborah French, Arconic's U.K. Sales Manager for Reynobond, exchanged emails with the executives of the companies that refurbished the Grenfell Tower regarding the availability of Reynobond PE and FR panels to be used on the Grenfell Tower. In the end, Arconic supplied the project with PE panels.

48.    A company director for Omnis Exteriors, the company that cut the Reynobond panels to fit the building exterior and supplied them to the cladding contractor, told the *Guardian*, the British daily newspaper, that the companies that refurbished Grenfell Tower asked them to use

Reynobond PE cladding, which is £2 cheaper per square meter than the alternative Reynobond fire retardant (FR).

49.     Architect and fire safety expert Sam Webb described the cladding system added to Grenfell Tower as part of the 2016 refurbishing program to the *Guardian* as "a disaster waiting to happen."

50.     Another architect quoted in a report issued in July 2017 by Architects for Social Housing stated that:

> If we are talking about the second issue, the cladding, ***no one in their right mind would specify the combustible type, partly because of case law, where architects who did specify that lost their defence at appeal in the High Court in 2003. You might as well clad the building in ten-pound notes dipped in Napalm***.

> The Principal Designer (in this case Studio E Architects) would normally seek ***written advice from the supplier – with a quote for supply*** – that the material is fit for purpose. In this case ***it is inconceivable that the manufacturer of Reynobond (Arconic Europe) would not recommend their "A2 Fire Solution"***, comprising an incombustible sandwich core that conforms with European fire certification EN 13501-1, class A2.

51.     According to British Chancellor Philip Hammond, the flammable cladding supplied by Arconic was illegal on tall buildings in Britain.  The cladding installed on Grenfell Tower was not designed for use on buildings taller than 10 meters high, a fraction of the 67-meter Grenfell Tower.

52.     According to the British Department for Communities and Local Government ("DCLG"), cladding with a flammable core, like the one used on Grenfell Tower, was banned on buildings over 18 meters high. A spokesman for the Department told *The Sunday Times* that "cladding using a composite aluminum panel with a polyethylene core should not be used for cladding on a building taller than 18m."

53.     Similarly, safety experts agreed that the decision to use the flammable panels on the Grenfell Tower was "disturbing" and "shocking."

54.     The director of the Fire Safety Engineering Group at the University of Greenwich explained that if fire penetrates the cladding, "[i]t is like you have got a high-rise building and you are encasing it in kerosene. It is insanity, pure and simple."

55.     A breach of building regulations is a criminal offense in the United Kingdom, and corporations can be prosecuted for manslaughter.

56.     British police investigating the fire at Grenfell Tower said they have "reasonable grounds" to suspect that corporate manslaughter offenses may have been committed, along with breaches of health and safety laws. A letter from the Metropolitan Police to surviving Grenfell Tower residents said that police officers had "seized a huge amount of material and taken a large number of witness statements." The Metropolitan Police stated that it was a "complex and far reaching investigation that by its very nature will take a considerable time to complete."

57.     Arconic attempted to distance itself from the disaster as its profits skyrocketed.  In the second quarter of 2017—the period including the inferno—Arconic reported profits of $212 million, an increase of 57 per cent from the same quarter of the previous year. "The business increased revenues and profitability, continued to expand margins and take out cost," touted David Hess, Arconic's interim chief executive. "We ended the first half of 2017 with significantly less debt, a strong cash position and good liquidity."

58.     In the meantime, Arconic pinned the blame of the fire on others: "Cladding systems contain various components selected and put together by architects, contractors, fabricators and building owners, and ***those parties are responsible for ensuring that the cladding systems are compliant under the appropriate codes and regulations***," the company said in a statement. That decision to stop selling the panels was made out of "an abundance of caution as ***Arconic does not control the ultimate design and installation of the final cladding system***," the Company said:

Our Reynobond products including Reynobond PE are permitted to be used in accordance with local building codes and regulations in the United States and the UK and other countries around the world. Cladding systems contain various components selected and put together by architects, contractors, fabricators and building owners, and those parties are responsible for ensuring that the cladding systems are compliant under the appropriate codes and regulations. For our portion in the supply chain, we believe we've been compliant in the sale of our product.

59.     Mr. Hess refused to discuss the size of Arconic's potential liability resulting from the fire.

60.     Following the tragedy at the Grenfell Tower, the DCLG ordered that the cladding be checked on any high-rise social housing under DCLG's control, specifically for the Reynobond PE cladding that was used on the Grenfell Tower refurbishment. Melanie Dawes, the DCLG permanent secretary, said: "We are therefore asking local authorities and other registered providers of social housing to identify whether any panels used in new-build or refurbishment are a particular type of cladding made of ACM."

61.     After the blaze at Grenfell Tower, the British government established an independent expert advisory panel to advise on immediate measures that should be put in place to help make buildings safe (the "Expert Panel"). On July 6, 2017, the Expert Panel recommended that a series of large scale tests be performed in order to help building owners make decisions regarding remediation.

62.     This series of tests included six combinations of cladding systems. The Expert Panel and other industry bodies inspected the design of the test systems to ensure that they matched ACM systems in common use. The first test evaluated a cladding system that mimicked the system used at Grenfell Tower and featured aluminum panels with core filler materials of unmodified polyethylene (PE), *i.e.*, ACM panels akin to the ones Arconic sells under the brand name Reynobond PE.

63.     The Expert Panel advised that the cladding panel system used in the first test did not meet U.K. building regulation guidance.  In fact, according to the test report, it was not possible to classify the ACM panels under U.K. building regulations, because "in order for a classification . . . to be undertaken, the cladding system must havbeen tested to the full test duration . . . without any early termination of the test."  The report stated that "[t]he minimum test duration is 40 minutes" and that the test was terminated after 8 minutes and 45 seconds, "due to flame spread above the test apparatus."  The report also found that the panel "would have failed to meet the external fire spread criterion if classification had been possible" because it reached a 15-minute fire spread marker in six-and-a-half minutes and exceeded the 600˚Celsius temperature ceiling by over 200.

## The Company's 2016 Proxy Statement

64.     On March 24, 2016, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2016 annual meeting of shareholders (the "2016 Proxy").  The 2016 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection.

65.     The 2016 Proxy included a section entitled "Compensation Discussion and Analysis," which stated, among other thigns, the following regarding compensations awards based upon achievement of safety goals:

> ***We Pay for Performance.*** We link our executives' compensation to measured performance in key financial and nonfinancial areas. ***As noted above, performance against rigorous adjusted FCF, average annual DWC, adjusted net income, adjusted EBITDA margin, revenue growth, safety, environmental, and workplace diversity targets is measured in determining compensation.*** These metrics, coupled with the individual performance multipliers, incentivize individual, business group, and corporate performance. The Company's strategic priorities are reflected in these compensation metrics.

66.     The 2016 Proxy further stated:

***Executive Vice President and Group President, Global Primary Products—Mr. Harvey.*** In January 2015, ***Mr. Harvey was granted performance share awards valued at $1,100,318 and stock options valued at $275,039, in his then-role as Executive Vice President, Human Resources and Environment, Health, Safety and Sustainability. This award was above the target based on his strong performance review in 2014. Mr. Harvey's annual IC award for 2015 of $454,307 was above target at 109.8% due to the IC plan result and his strong performance in the start of 2015 as Executive Vice President, Human Resources and Environment, Health, Safety and Sustainability and thereafter, as of October 2015, Executive Vice President and Group President, Global Primary Products.*** The award was based on the corporate IC plan result of 88.5%, as described above, the IC plan results for the GPP business group, which he has led since October 2015, and an individual multiplier of 120%. The GPP group's IC plan for 2015 had the same design as the corporate plan and similar financial metrics. The GPP group's IC plan result for 2015 was 107.3% based on the group's contribution to the overall corporate results (see the discussion on GPP performance on page 45). Mr. Harvey received a 1% salary increase effective October 5, 2015 upon his promotion to his new role.

67.     In addition, the 2016 Proxy solicits the Company's shareholders to vote in favor of the "Re-Approval of the Material Terms of the Performance Goals under the Alcoa Inc. 162(m) Compliant Annual Cash Incentive Plan, as Amended and Restated.  Among the terms of the Cash Incentive Plan are "the achievement of sustainability measures, community engagement measures or environmental, health or safety goals of the Company or the subsidiary, division or business unit of the Company for or within which the Participant is primarily employed. . . ."

68.     In other words, the Company awarded an executive officer compensation based upon "strong performance" in the role of Executive Vice President, Human Resources and Environment, Health, Safety and Sustainability in 2015, and asked for shareholders to vote in favor of the re-approval of a plan allowing such compensation to be granted.  However, the above statements in the 2016 Proxy were false and misleading and omitted material information because they fail to disclose that, as early as 2014, the Company was aware (as further detailed below) that the Reynobond PE products it supplied to high-rise buildings posed a serious safety risk of fire and had in fact failed to meet critical fire safety tests.

16

69.     By omitting information regarding the safety of the Company's Reynobond PE products, shareholders voting on whether to re-approve such a plan would find such information material because the Company's knowledge of (and subsequent failure to disclose) a serious safety risk within one of its products would directly impact the issuance of compensation under said compensation plan.

**Defendants' Additional False and Misleading Statements Throughout the Relevant Period**

70.     On or about November 20, 2013, the Company made the following representations regarding its Reynobond ACM products, on its official website:

> [E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

> Safe and Compliant. Reynobond is designed and tested to meet safety and environmental building codes around the world. It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

> Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core. This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

> Reynobond is a fully tested product, with building-code approvals throughout the world. It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

> Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process. Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

> Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

71.     The Company made the same or similar statements to those in ¶ 142 above on or about December 12, 17, and 27, 2013, on its website.

72.     On or about November 20, 2013, the Company made the following statements with respect to its development and implementation of operational controls, on its official website:

Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved. We develop procedures to cover . . . external activities, including contractor and product safety.

73.     On or about November 20, 2013, the Company also represented the following on its

official website:

The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .

                    *        *        *

Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

74.     On or about November 20, 2013, the Company made the following statements with

respect to its values, on its official website:

Our Values
We live our Values every day, everywhere, collaborating for the benefit of our customers, investors . . . communities and partners.

Integrity
We are open, honest, and accountable.

Environment, Health & Safety
We work safely . . . and protect the environment.

75.     Defendants' above statements which specifically discuss the features of the

Reynobond ACM products, including Reynobond PE, were false and misleading because at the

time these statements were made, Defendants failed to disclose that Arconic was selling

Reynobond PE for use in construction projects, where the product was to be used in a manner that

the Company knew was unsafe and presented a fire hazard.

76.     Defendants' statements made in 2013 related to the Company's adopted procedures

to cover contractor and product safety were false and misleading because at the time these

statements were made, (i) Arconic did not employ safety procedures to cover its contractors and

product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE products for use in high-rise tower projects across the U.K. and other countries.

77.     Defendants' statements made in 2013 vouching that Arconic is "open" and "honest" were false and misleading because Defendants failed to disclose that, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

78.     On or about January 9, 2014, Arconic issued a press release announcing its financial results for the quarter and year ended December 31, 2013 ("Q4 2013" and "FY 2013," respectively). For Q4 2013, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.4 billion and that "ATOI [after-tax operating income] was a "fourth quarter record" of $168 million, down $24 million sequentially and up $28 million, or 20 percent, year-over-year."

79.     For FY 2013, the press release reported that Arconic's Engineered Products and Solutions segment had generated $5.7 billion in third-party sales and $726 million of ATOI.

80.     On February 13, 2014, Arconic filed its Form 10-K for the fiscal year ended December 31, 2013 with the SEC ("2013 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Kleinfeld, among others.  Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2013 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment improved 4% in 2013 compared with 2012 ," "Third-party sales for this

segment increased 3% in 2012 compared with 2011 ," "ATOI [after-tax operating income] for the Engineered Products and Solutions segment rose $114 in 2013 compared with 2012, principally the result of net productivity improvements across all businesses," and "ATOI for this segment climbed $75 in 2012 compared with 2011 . . . ." The 2013 10-K also stated, in pertinent part, that "[i]n 2014, the building and construction end market is expected to improve as the gradual recovery in North America continues and the decline in Europe slows down."

81.     The 2013 10-K also reported sales of architectural aluminum systems of $977 million for full year 2013.

82.     The 2013 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety and compliance with U.S. and foreign export laws . . . and sales and trading practices. Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts." "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

83.     The 2013 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate. Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites. Additionally, evolving regulatory standards and expectations can result in increased

litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

84.    The Company's 2013 Annual Report sent to investors in early 2014 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized Reynobond panels' contribution to "the bright future for Alcoa's $1.5 billion commercial construction businesses," stating, in pertinent part:

> The beautiful cauldron holding the Olympic flame above the Sochi Winter Games was touted by the Russian hosts as a symbol of an environmentally-friendly Olympics.  Built with panels made from Alcoa's architectural aluminum, it is also a symbol of Alcoa innovation and *the bright future for Alcoa's $1.5 billion commercial construction businesses*.  The *Alcoa Reynobond® panels* in the cauldron were coated with an innovative technology called EcoClean™ that is self-cleaning and removes pollutants from the air.  In addition to aesthetic and emissions benefits, *Alcoa's new aluminum architectural systems provide buildings with stronger impact protection* and more than 50% better thermal performance than traditional methods.  As governments and customers seek to reduce the high energy consumption and resultant emissions of buildings, *Alcoa's "green building" innovations enabled Alcoa to grow our business during the construction drought of the past five years and position us for dramatic growth when the commercial real estate market rebounds*.

85.    The Chairman's Letter lauded the Company's purported strong commitment to safety values on a global level, stating, in pertinent part:

> We continued to reaffirm Alcoa's Values during 2013. *We launched a global Integrity Champion Network of high potential managers to further embed a values-based culture of integrity and compliance at all levels of the Company*. *Our employees' strong commitment to* our Environment, *Health and Safety Value* resulted in Alcoa's first fatality free year in *the 70 years since the Company began monitoring safety on a global basis*.

86.    The 2013 Annual Report specifically emphasized the Company's purported strong safety values, stating, in pertinent part:

> *Alcoa is a values-based company*. *Our Values—Integrity*, Respect, Innovation, *Excellence and Environment, Health and Safety*—guide our work and help us accomplish our goals the right way. *They also align us with our stakeholders*, from

employees, customers and suppliers to investors and the communities in which we operate.

87.     The 2013 Annual Report also specifically highlighted the successes of the Engineered

Products and Solutions segment, stating, in pertinent part:

**ENGINEERED PRODUCTS AND SOLUTIONS**

Our products . . . enable buildings that are . . . safe, . . . Engineered Products and Solutions, part of Alcoa's value-add portfolio, performed against targets set in 2010 and generated $970 million incremental revenue from share gains through innovation, while growing adjusted EBITDA margins from 2010 to 2013.

88.     On or about March 7, 2014, the Company made the following statements with respect

to its development and implementation of operational controls, on its official website:

Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved. We develop procedures to cover . . . external activities, including contractor and product safety.

89.     On or about March 7, 2014, the Company also represented the following on its

official website:

The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .

*     *     *

Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

90.     On or about March 7, 2014, the Company made the following statements with respect

to its values on its official website:

Our Values
We live our Values every day, everywhere, collaborating for the benefit of our customers, investors . . . communities and partners.

Integrity
We are open, honest, and accountable.

Environment, Health & Safety
We work safely . . . and protect the environment.

91.     On or about March 7, 2014, Arconic stated the following concerning "Environment,

Health and Safety" ("EHS") on its official website:

EHS POLICY

It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which
respects the environment and the health of our employees, our customers and the
communities where we operate. We will not compromise environmental, health or
safety values for profit or production.  All [Arconic]ans are expected to understand,
promote and assist in the implementation of this Policy and the accompanying
Principles.

92.     Under the heading "EHS Principles," Arconic further stated that:

•       We value human life above all else and manage risks accordingly.

                    *       *       *

•       We do not compromise our EHS Value for profit or production.
•       We comply with all laws and set higher standards for ourselves and
        our suppliers where unacceptable risks are identified.

                    *       *       *

•       We supply and use safe and reliable products and services.

•       We use our knowledge to enhance the safety and well-being of our
        communities.

93.     On or around March 10, 2014, the Company made the following representations

regarding its Reynobond ACM products, on its official website:

[E]ach of our product offerings provide the durability to ensure your project will look
pristine for years to come—with minimal maintenance.

Safe and Compliant. Reynobond is designed and tested to meet safety and
environmental building codes around the world. It is available with either a
polyethylene (PE) core or a fire-resistant (FR) core material . . . .

Reynobond® Aluminum Composite Material (ACM) is a high-performance wall
cladding product from Alcoa Architectural Products, consisting of two sheets of
nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded

thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

Reynobond is a fully tested product, with building-code approvals throughout the world. It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process.  Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

Our Reynobond® Aluminum Composite Material delivers consistent  strength.

94.     On or about April 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended March 31, 2014 ("Q1 2014").  For Q1 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.4 billion and that "ATOI was a first quarter record of $189 million, up $21 million, or 13 percent, sequentially and up $16 million, or 9 percent, year-over-year."

95.     On or about April 24, 2014, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2014 10-Q").  The Q1 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.

96.     Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

97.     The Q1 2014 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 9, 2014 press release.

98.     On or about May 2, 2014, Arconic held an annual shareholders meeting, in which Defendant Kleinfeld participated. At the meeting, Kleinfeld stated the following about the Company's safety record:

> So let's first start with our most important thing, safety. And as you can see here, this is our safety track record. And we already are know [sic] not only in our industry, but beyond our industry, to have a very, very, very good safety record.

99.     On or about May 8, 2014, Arconic filed its Form 8-K current report with the SEC ("May 8, 2014 Form 8-K"). Attached to the May 8, 2014 Form 8-K as an exhibit and expressly incorporated into it by reference was Arconic's 2013 Sustainability Highlights Report.  The Report represented that "*[w]e also have developed state-of-the-art framing and wall systems that are hurricane and blast resistant*." The 2013 Sustainability Highlights Report also stated that "*architectural aluminum systems that use advanced thermal technologies can provide superior thermal performance without compromising structural performance*."

100.    The May 8, 2014 Form 8-K also advised that "[m]ore in-depth sustainability information and performance data for the company will be available online in the Sustainability section of the company's website at www.alcoa.com beginning May 13, 2014."

101.    On or about May 13, 2014, Arconic posted to the Sustainability section of its official website a "Chairman & CEO Statement" attributed to Defendant Kleinfeld.  In the Chairman & CEO Statement, Defendant Kleinfeld stated that "*[b]y reinforcing that nothing is more valuable than human life, [Arconic] has progressively improved its safety performance over the years*."

102.    On or about July 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended June 30, 2014 ("Q2 2014"). For Q2 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of

$1.5 billion, and that "ATOI was a quarterly record of $204 million, up $15 million, or 8 percent, sequentially and up $11 million, or 6 percent, year-over-year."

103.    On or about July 24, 2014, Arconic filed its Form 10-Q for the quarter ended June 30, 2014 with the SEC ("Q2 2014 10-Q"). The Q2 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

104.    The Q2 2014 10-Q set forth figures substantially similar to those described above regarding Arconic's July 8, 2014 press release.

105.    On or about October 8, 2014, Arconic issued a press release announcing its financial results for the quarter ended September 30, 2014 ("Q3 2014"). For Q3 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.495 billion, and that "ATOI was a quarterly record of $209 million, up $5 million, or 2 percent, sequentially and up $17 million, or 9 percent, year-over-year." The press release also stated that "EPS delivered its eighteenth consecutive quarter of year-over-year ATOI improvement."

106.    On or about October 23, 2014, Arconic filed its Form 10-Q for the quarter ended September 30, 2014 with the SEC ("Q3 2014 10-Q"). The Q3 2014 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

107.    The Q3 2014 10-Q set forth figures substantially similar to those described above regarding Arconic's October 8, 2014 press release.

108.    Defendants' statements made in 2014, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

109.    Defendants' statements made in 2014 related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE products for use in high-rise tower projects across the U.K. and other countries.

110.    Defendants' statements made in 2014 vouching that Arconic is "open" and "honest" were false and misleading because Defendants failed to disclose that, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

111.    Defendants' statements made in 2014 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

112.    Defendants' statements made in 2014 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products, and that its sales were increasing) were false and misleading because Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

113.    On or about January 12, 2015, Arconic issued a press release announcing its financial results for the fourth fiscal quarter and year ended December 31, 2014 ("Q4 2014" and "FY 2014," respectively). For Q4 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.566 billion, and ATOI of $165 million, which was "its 19th consecutive quarter of year-over-year after-tax operating income growth, excluding Firth Rixson."

114.    For FY 2014, the press release reported that Arconic's Engineered Products and Solutions segment had generated $6.006 billion in third-party sales and $767 million of ATOI.

28

115.     On February 19, 2015, Arconic filed its Form 10-K for the fiscal year ended December 31, 2014 with the SEC ("2014 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the 2014 10-K stated that "[t]hird-party sales for the Engineered Products and Solutions segment increased 5% in 2014 compared with 2013, primarily due to higher volumes" "Third-party sales for this segment increased 4% in 2013 compared with 2012 . . . .," "ATOI [after-tax operating income] for the Engineered Products and Solutions segment climbed $41 in 2014 compared with 2013, mainly due to net productivity improvements across all businesses," and "ATOI for this segment climbed $114 in 2013 compared with 2012."

116.     The 2014 10-K also stated, in pertinent part, that "[i]n 2015, the building and construction end market is expected to improve through growth in North America for the non-residential sector but will be somewhat offset by overall weakness in Europe."

117.     The 2014 10-K also reported sales of architectural aluminum systems of $1,002 million for full year 2014.

118.     The 2014 10-K also represented that "Alcoa may be subject to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety and compliance with U.S. and foreign export laws . . . and sales and trading practices. Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts." "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

119.    The 2014 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . .health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate.  Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites.  Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

120.    The Company's 2014 Annual Report sent to investors in early 2015 included a Chairman's Letter signed by Defendant Kleinfeld that emphasized that Arconic's "businesses benefit from a set of Alcoa Values that have endured the test of time—Integrity; Respect; Environment, Health and Safety; Innovation; and Excellence."

121.    Further expounding on the Company's purported "Values," the 2014 Annual Report emphasized the Company's strong commitments to safety, ethics and compliance in all of its product offerings, stating, in pertinent part:

> ***Our Alcoa Values – Integrity, Respect, Innovation, Excellence and Environment, Health and Safety – bring out the best in our employees and our Company. As Alcoa transforms, our Values serve as a bright beacon, continuing to guide how we work with our stakeholders and communities***.

> ***Safety***

> ***Our world-class safety culture values human life above all else, seeks to manage risk accordingly*** . . . .

> Ethics and Compliance

> . . . ***The Ethics and Compliance Program continues to focus on*** anti-corruption, trade compliance and ***adherence with all relevant U.S. and national laws and regulations***.

122.    The 2014 Annual Report also specifically highlighted the successes of the Engineered

Products and Solutions segment, stating, in pertinent part:

**ENGINEERED PRODUCTS AND SOLUTIONS**

2014 was the best year ever for our innovative, multi-material Engineered Products
and Solutions (EPS) segment. It generated $6.0 billion in third-party revenues and
$767 million in after-tax operating income (ATOI) with an adjusted EBITDA margin
of 21.9%. By engineering proprietary ***products that are highly valuable to
customers across*** its aerospace, commercial transportation, ***building and
construction***, industrial gas turbine, and oil and gas end markets, ***EPS drove strong
share gains across all of its businesses. The segment signed a number of valuable
contracts throughout the year . . . .***

123.    On or around February 5, 2015, the Company made the following representations

regarding its Reynobond ACM products, on its official website:

[E]ach of our product offerings provide the durability to ensure your project will look
pristine for years to come—with minimal maintenance.

Safe and Compliant. Reynobond is designed and tested to meet safety and
environmental building codes around the world. It is available with either a
polyethylene (PE) core or a fire-resistant (FR) core material . . . .

Reynobond® Aluminum Composite Material (ACM) is a high-performance wall
cladding product from Alcoa Architectural Products, consisting of two sheets of
nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded
thermoplastic core.  This is an elegant concept resulting in an extraordinary flat and
highly formable material with an excellent strength-to-weight ratio.

Reynobond is a fully tested product, with building-code approvals throughout the
world. It is available with either a Polyethylene (PE) core or a Fire Resistant (FR)
core.

Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in
a continual process.  Alcoa Architectural Products has a reputation for manufacturing
products of the highest quality, and Reynobond is no exception.

Our Reynobond® Aluminum Composite Material delivers consistent  strength.

124.    On or about February 5, 2015, the Company made the following statements with

respect to its development and implementation of operational controls on its official website:

Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved. We develop procedures to cover . . . external activities, including contractor and product safety.

125.     On or about February 5, 2015, the Company also represented the following on

its official website:

Our Values
We live our Values every day, everywhere, collaborating for the benefit of our customers, investors . . . . communities and partners.

Integrity
We are open, honest, and accountable.

Environment, Health & Safety
We work safely . . . .   and protect the environment.

126.     On or about April 8, 2015, Arconic issued a press release announcing its financial

results for the quarter ended March 31, 2014 ("Q1 2015").  For Q1 2015, the press release reported

that Arconic's Engineered Products and Solutions segment had generated third-party sales of $1.689

billion, and that "After-tax operating income (ATOI) was a first quarter record of $191 million, up

$2 million, or 1 percent, year-over-year, and up $26 million, or 16 percent, sequentially."

127.     On or about April 23, 2015, Arconic filed its Form 10-Q for the quarter ended March

31, 2014 with the SEC ("Q1 2015 10-Q").  The Q1 2015 10-Q was signed on behalf of Arconic by

its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002,

Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in

light of the circumstances under which such statements were made, not misleading with respect to

the period covered by this report."

128.     The Q1 2015 10-Q set forth financial results substantially similar to those described

above regarding Arconic's April 8, 2015 press release.

129.    On or about May 1, 2015, Arconic held an annual shareholders meeting, where Defendant Kleinfeld participated.  On the call, Kleinfeld stated the following about the Company's steps to guarantee safety:

> But as is customary and as it reflects our values, *we always start with safety, safety first*. So on the left hand side, here you see the safety statistics and as you see, I mean, we have achieved a lot in the last year, and this is pretty amazing, I mean, many see us as a benchmark in not only in our industry but also in other industries. And if you look at those numbers here, I mean it is -- I'm always wondering how much further can we go down here but every year, we are able to get the safety one step further.
>
> \*      \*      \*
>
> *. . . . [w]e have a very strong as you know, safety culture and we have also a very strong culture and reminding people on the risk. But we have created new tools and used this to basically shake the organization up to say, look, I mean we cannot afford to have anything routine in there because the moment people don't think, something terrible might happen*.
>
> *So we have introduced new tools to basically, recognize hazards, fix it -- find it, fix it and share it, program, we have created a -- we have this human performance certification process that every facility has to go through and almost all have gone through that in different rates*.

130.    On or about July 8, 2015, Arconic issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2015 ("Q2 2015"). For Q2 2015, the press release reported that Arconic's Engineered Products and Solutions segment had generated sales of $1.733 billion, and that "[a]fter-tax operating income (ATOI) was a record $210 million, up $8 million, or 4 percent, year-over-year from $202 million (revised from $204 million\*), and up $16 million, or 8 percent, from $194 million (revised from $191 million\*) sequentially."

131.    On or about July 22, 2015, Arconic filed its Form 10-Q for the quarter ended June 30, 2015 with the SEC ("Q2 2015 10-Q"). The Q2 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

132.    The Q2 2015 10-Q set forth figures substantially similar to those described above regarding Arconic's July 8, 2015 press release.

133.    On or about September 8, 2015, Arconic stated the following concerning "Environment, Health and Safety" ("EHS") on its official website:

EHS POLICY

It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which respects the environment and the health of our employees, our customers and the communities where we operate. We will not compromise environmental, health or safety values for profit or production.  All [Arconic]ans are expected to understand, promote and assist in the implementation of this Policy and the accompanying Principles.

134.    Under the heading "EHS PRINCIPLES," Arconic further stated that:

- "We value human life above all else and manage risks accordingly."

- We do not compromise our EHS Value for profit or production.

- We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified.

- We supply and use safe and reliable products and services.

- We are all accountable for conforming with and deploying our EHS Value and Principles.

135.    On or about October 8, 2015, Arconic issued a press release announcing its financial results for the third fiscal quarter ended September 30, 2015 ("Q3 2015"). For Q3 2015, the press release reported that Arconic's Transportation and Construction Solutions segment (separated as of Q3 2015 from Engineered Products and Solutions as a reportable segment, and which encompassed the business unit that made Reynobond) had generated third-party sales of $475 million, and ATOI

34

of $44 million.

136.    On or about October 23, 2015, Arconic filed its Form 10-Q dated October 22, 2015 for the quarter ended September 30, 2015 with the SEC ("Q3 2015 10-Q").  The Q3 2015 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

137.    The Q3 2015 10-Q set forth figures substantially similar to those described above regarding Arconic's October 8, 2015 press release.

138.    Defendants' statements made in 2015, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

139.    Defendants' statements made in 2015 related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its

marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

140.    Defendants' statements made in 2015 vouching that Arconic is "open" and "honest" were false and misleading because Defendants failed to disclose that, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

141.    Defendants' statements made in 2015 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

142.    Defendants' statements made in 2015 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products, and that its sales were increasing) were false and misleading because the Arconic Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

143.    On or about January 9, 2016, the Company made the following representations regarding its Reynobond ACM products on its official website:

[E]ach of our product offerings provide the durability to ensure your project will look pristine for years to come—with minimal maintenance.

Safe and Compliant. Reynobond is designed and tested to meet safety and environmental building codes around the world. It is available with either a polyethylene (PE) core or a fire-resistant (FR) core material . . . .

Reynobond® Aluminum Composite Material (ACM) is a high-performance wall cladding product from Alcoa Architectural Products, consisting of two sheets of nominal 0.020'' (0.50 mm) aluminum, each permanently bonded to an extruded thermoplastic core. This is an elegant concept resulting in an extraordinary flat and highly formable material with an excellent strength-to-weight ratio.

Reynobond is a fully tested product, with building-code approvals throughout the world. It is available with either a Polyethylene (PE) core or a Fire Resistant (FR) core.

Reynobond is manufactured to exacting tolerances with state-of-the-art equipment in a continual process. Alcoa Architectural Products has a reputation for manufacturing products of the highest quality, and Reynobond is no exception.

Our Reynobond® Aluminum Composite Material delivers consistent . . . strength.

144.    On or about January 9, 2016, the Company made the following statements with respect to its development and implementation of operational controls on its official website:

Operations and activities that could result in risk or impact are controlled to ensure that our environment, health and safety (EHS) policy is followed and that management system objectives are achieved. We develop procedures to cover . . . external activities, including contractor and product safety.

145.    On or about January 9, 2016, the Company also represented the following on its official website:

The following are the four main activities undertaken in support of our safety system: Identifying hazards and assessing the risks associated with our products . . . .

\*       \*       \*

Our global focus and attention on fatality prevention continues with the objection of building a system and culture that is more robust in its ability to . . . address contractor and contracted services safety.

146.    On or about January 9, 2016, the Company made the following statements with

respect to its values on its official website:

> Our Values
> We live our Values every day, everywhere, collaborating for the benefit of our customers, investors . . . communities and partners.
>
> Integrity
> We are open, honest, and accountable.
>
> Environment, Health & Safety
> We work safely . . . and protect the environment.

147.    On or about January 11, 2016, Arconic issued a press release announcing its financial results for the quarter and year ended December 31, 2015 ("Q4 2015" and "FY 2015," respectively). For Q4 2015, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $444 million, and ATOI of $40 million.

148.    For FY 2015, the press release reported that Arconic's Transportation and Construction Solutions segment had generated $1.882 billion in third-party sales and $166 million of ATOI.

149.    On February 19, 2016, Arconic filed its Form 10-K for the fiscal year ended December 31, 2015 with the SEC ("2015 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's new "Transportation and Construction Solutions" segment, which included sale of "integrated aluminum structural systems," the 2015 10-K stated that "[t]hird-party sales for the Transportation and Construction Solutions segment decreased 7% in 2015 compared with 2014, primarily driven by unfavorable foreign currency movements . . ." "ATOI [after-tax operating income] for the Transportation and Construction Solutions segment declined $14 in 2015 compared with 2014, mainly due to higher costs, net unfavorable foreign currency movements, primarily related to a weaker euro and Brazilian real, and unfavorable price/product mix."

150.    The 2015 10-K also stated, in pertinent part, that "[i]n 2016, . . . net productivity

improvements [were] anticipated while pricing pressure across all markets [was] expected."

151.   The 2015 10-K also reported sales of architectural aluminum systems of $951 million for full year 2015.

152.   The 2015 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety and compliance with U.S. and foreign export laws . . . and sales and trading practices. Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts." "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

153.   The 2015 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate. Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites. Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

154.   The Company's 2015 Annual Report sent to investors in early 2016 included a Chairman's Letter signed by Defendant Kleinfeld emphasizing that in Arconic's "building and construction business, [its] innovative architectural systems [were] helping builders meet E.U. and U.S. commitments for zero energy buildings and [were] driving [its] business' expansion into China

and the Middle East."

155.    The Chairman's Letter went on to emphasize in pertinent part that "[w]hile applying disruptive technologies and strategies and working toward the separation, [the Company] ha[d] been careful to retain the core Values that ha[d] been [its] bedrock for 127 years."

156.    Elsewhere the 2015 Annual Report highlighted the financial results achieved in the "Construction Solutions" segment that sold the Reynobond panels, stating that it had "reported ATOI [after-tax operating income] of $166 million in 2015. It also delivered a solid 2015 adjusted EBITDA [earnings before interests, taxes, depreciation and amortization] margin of 14.4 percent."

157.    As in past years, the 2015 Annual Report also emphasized the Company's purported strong values, stating they "center on ***Integrity . . . and Safety***," and that the Company "***live[d] [its] Values every day, everywhere for the benefit of [its] customers, investors, employees, communities and partners***."

158.    The 2015 Annual Report further emphasized that the Company's "Ethics and Compliance Program continue[d] to focus on . . . ***adherence with all relevant U.S. and international laws and regulations***."

159.    On or about March 2, 2016, Arconic stated the following concerning "Environment, Health and Safety" ("EHS") on its official website:

EHS POLICY

It is [Arconic]'s policy to operate worldwide in a safe, responsible manner which respects the environment and the health of our employees, our customers and the communities where we operate. We will not compromise environmental, health or safety values for profit or production.  All [Arconic]ans are expected to understand, promote and assist in the implementation of this Policy and the accompanying Principles.

160.    Under the heading "EHS Principles," Arconic further stated that:

•        We value human life above all else and manage risks accordingly.

* * *

- We do not compromise our EHS Value for profit or production.

- We comply with all laws and set higher standards for ourselves and our suppliers where unacceptable risks are identified.

* * *

- We supply and use safe and reliable products and services.

- We use our knowledge to enhance the safety and well-being of our communities.

161.     The statements made on March 2, 2016 above were also made by Arconic on its official website on October 27, 2016.

162.     On or about April 11, 2016, Arconic issued a press release announcing its financial results for the quarter ended March 31, 2016 ("Q1 2016"). For Q1 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $429 million, and ATOI of $39 million.

163.     On or about May 5, 2016, Arconic filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC ("Q1 2016 10-Q"). The Q1 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

164.     The Q1 2016 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 11, 2016 press release.

165.     On or about May 6, 2016, Arconic held an annual shareholders meeting, in which

Defendant Kleinfeld participated.  At the shareholders meeting, Kleinfeld stated the following about the Company's emphasis on safety:

> And let me go through starting with Safety. So as those that are longer shareholders know, we take safety very, very seriously and we have made great progress, as you can see on the left hand side. And really are setting benchmarks for others.

166.    On or about May 13, 2016, Arconic posted its 2015 Sustainability Report to its official website and posted a link to the report on Arconic's official Twitter account.

167.    The 2015 Sustainability Report featured a "Chief Executive Officer Statement" attributed to Defendant Kleinfeld that represented the following about Arconic:

> We create thermally efficient architectural aluminum systems that help improve building energy-efficiency by up to 50%. ***Our state-of-the-art framing and wall systems are also hurricane and blast-resistant, making buildings more resilient and increasing occupant safety***.

168.    The 2015 Sustainability Report also stated that "Many of our top leaders and employees around the world are involved in the writing of individual sections of our sustainability report, or they provide significant input and feedback," and that "the draft report is provided to the Public Issues Committee of the Alcoa Board of Directors and our Executive Council for review."

169.    Kleinfeld served on Arconic's Executive Council at the time that the 2015 Sustainability Report was posted to Arconic's website and had served on the Executive Council from the beginning of the Relevant Period.

170.    Regarding Arconic's "Building and Construction" business unit, whose "recent innovations include Reynobond NC Double Sheet aluminum composite material panels," the 2015 Sustainability Report stated the following:

> - We also have developed state-of-the-art framing and wall systems that are hurricane- and blast-resistant and have been tested to industry standards and state mandates. ***These systems are designed to minimize vulnerabilities and provide increased security to protect occupants against damage and devastation.***

- Architectural aluminum systems that use advanced thermal technologies can provide superior thermal performance ***without compromising on structural performance***.

- Aluminum architectural systems can improve energy efficiency, reduce carbon dioxide emissions, help achieve green building standards, and ***increase occupant comfort and security***.

171.    Additionally, the 2015 Sustainability Report described "Health and Safety" as one of eight "Material Aspects" of its business.

172.    Regarding Health and Safety at Arconic, the 2015 Sustainability Report represented that:

- Arconic observed two boundaries: an "internal boundary" consisting of "All global operations where we have financial and operational control" and an "external boundary" consisting of "Government agencies focused on health and safety in each country in which we operate and communities surrounding our operating locations."

- Arconic was "Committed to Truth in Reporting" and to that end had "a rigorous internal audit process that evaluates our locations on five areas: environmental; health and safety; operational excellence; financial  and business processes; and information technology.

- As part of its stated commitment to "Truth in Reporting," Arconic maintained "Health and Safety Committees: Each location has various task, department, ad hoc, and other committees to develop and implement health and safety programs based on the location's strategic health and safety plan. These leadership groups include a cross-section of personnel from the facility."

- "We were the first aluminum company to receive Cradle to Cradle Certification, which is a multi-attribute eco-label that assesses a product's safety to humans and potential impact on the natural environment."

173.    Concerning "Customer Health/Product Safety," the 2015 Sustainability Report represented that Arconic's "efforts to ensure customer health and product safety" included "Challenging misguided/bad science with best available scientific research" and "Engaging

43

regulators as appropriate."

174.    The Sustainability Report further stated that:

[Arconic has] a Product Safety Standard to identify what is required for product safety management systems developed by our businesses. The standard includes requirements for raw material sources, production practices, chemical composition of our products, and ***communication of risks associated with use or abuse of these products***.

We also provide safety data sheets and other documents that communicate information on the proper use, reuse, and/ or disposal of our products. ***These sheets include the potential health risks associated with use and misuse of these products and the precautionary measures that can be used to reduce or eliminate these risks***.

175.    On or about July 11, 2016, Arconic issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2016 ("Q2 2016"). For Q2 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $467 million, and ATOI of $46 million.

176.    On or about July 29, 2016, Arconic filed its Form 10-Q for the quarter ended June 30, 2016 with the SEC ("Q2 2016 10-Q"). The Q2 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

177.    The Q2 2016 10-Q set forth financial results substantially similar to those described above regarding Arconic's July 11, 2016 press release.

178.    On or about November 9, 2016, Arconic filed its Form 10-Q for the quarter ended September 30, 2016 with the SEC ("Q3 2016 10-Q"). The Q3 2016 10-Q was signed on behalf of Arconic by its CFO and its Controller.  Also, pursuant to Section 302 of the Sarbanes-Oxley Act of

44

2002, Defendant Kleinfeld certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

179.    The Q3 2016 10-Q reported that, for Q3 2016, Arconic's Transportation and Construction Solutions segment had generated third-party sales of $475 million, and ATOI of $44 million.

180.    On or about November 12, 2016, the Company made the following representations on its official website regarding the use of its architectural products in buildings:

> Fire is a key issue when it comes to buildings.
>
> When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly.
>
> Important to take the "fire characteristic" into account when starting the construction or refurbishment of a building in order to protect the people and assets while limiting fire propagation.  It is especially crucial for public establishments such as hospitals, schools, offices, etc.
>
> Buildings are also classified according to their height and destination (public buildings, industrial building, housings…): it will also define which materials are safer to use. Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade to the fire in the building: as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.



As soon as the building is higher than the firefighters' ladders,
it has to be conceived with an incombustible material.

181.    On December 14, 2016, Arconic made a presentation in connection with the Company's Investor Day.  Defendant Kleinfeld participated, as did Tim Myers ("Myers"), the Group President of Arconic's Transportation and Construction Solutions segment ("TCS").

182.    Regarding Arconic's "architectural products," including Reynobond, Myers stated that "We need to have products that are offering differentiated safety benefits for the occupant, right? So that gives us the opportunity then to unleash Arconic's technology[.]" Regarding Reynobond, a slide accompanying the Investor Day presentation stated that Arconic was "*[i]mproving [Reynobond's] core technology to increase fire retardant performance*."

183.    Defendants' statements made in 2016, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

184.    Defendants' statements made in 2016 related to the Company's commitment to safety, its touted safety performance, its adopted procedures to cover contractor and product safety, and its assurances that the Company supplies and uses safe and reliable products and services were

false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii) Arconic's strong assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

185.     Defendants' statements made in 2016 vouching that Arconic is "open" and "honest" were false and misleading because Defendants failed to disclose that, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

186.     Defendants' statements made in 2016 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US and foreign sale sales and trading practices, and their statements that Arconic complies with all laws (including safety laws) and sets high standards for suppliers where unacceptable risk are identified, were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

187.     Defendants' statements made in 2016 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products) were false and misleading because Defendants failed to disclose that Reynobond PE

sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

188.    Defendants' statements made in 2016 concerning the use of its architectural products in buildings, including the representations related to the fact that "fire is a key issue when it comes to buildings," were false and misleading because, at the time these statements were made, Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard, directly contradicting the Company's representations.

189.    On or about January 31, 2017, Arconic issued a press release announcing its financial results for the fourth fiscal quarter and full year ended December 31, 2016 ("Q4 2016" and "FY 2016," respectively). For Q4 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $456 million, and "record fourth quarter ATOI of $44 million, up $4 million, or 10 percent, year over year."

190.    For FY 2016, the press release reported that Arconic's Transportation and Construction Solutions segment had generated $1.802 billion in third-party sales and $176 million of ATOI.

191.    On February 28, 2017, Arconic filed its Form 10-K for the fiscal year ended December 31, 2016 with the SEC ("2016 10-K"), which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Kleinfeld. Concerning sales in Arconic's new "Transportation and Construction Solutions" segment, which included sale of "integrated aluminum structural systems," the 2016 10-K stated that "[t]hird-party sales for the Transportation and Construction Solutions segment decreased 4% in 2016 compared with 2015, primarily driven by lower demand from the North American commercial transportation end market, which was partially

48

offset by rising demand from the building and construction end market. . . ." "ATOI [after-tax operating income] for the Transportation and Construction Solutions segment increased $10, or 6%, in 2016 compared with 2015, principally driven by net productivity improvements across all businesses and growth in the building and construction segment."

192.    The 2016 10-K also reported sales of architectural aluminum systems of $1,010 million for full year 2016.

193.    The 2016 10-K also represented that "Alcoa may be exposed to significant legal proceedings [and] investigations" and that the "Company is . . . subject to a variety of legal compliance risks," including "potential claims relating to product liability, health and safety and compliance with U.S. and foreign export laws . . . and sales and trading practices. Alcoa could be subject to fines, penalties, damages (in certain cases, treble damages), or suspension or debarment from government contracts." "Alcoa believes it has adopted appropriate risk management and compliance programs to address and reduce these risks."

194.    The 2016 10-K also stated that "Alcoa is subject to a broad range of health, safety and environmental laws and regulations in the jurisdiction in which it operates and may be exposed to substantial costs and liabilities associated with such laws and regulations." "Compliance with . . . health and safety legislation and regulatory requirements may prove to be more limiting and costly than we anticipate. Alcoa's results of operations or liquidity in a particular period could be affected by certain health, safety or environmental matters, including remediation costs and damages related to certain sites. Additionally, evolving regulatory standards and expectations can result in increased litigation and/or increased costs, all of which can have a material and adverse effect on earnings and cash flows."

195.    The cover of the 2016 Annual Report emphasized that [w]orking in close partnership

with our customers, we solve complex engineering challenges to transform the way we . . . build . . . ,” and that “[t]hrough the ingenuity of our people and cutting-edge, advanced manufacturing techniques, ***we deliver these products at a quality and efficiency that ensure customer success and shareholder value.***”

196.    Arconic’s 2016 Annual Highlights Report sent to investors in early 2017 lauded the financial performance in its new Transportation and Construction Solutions segment, stating that it had “recorded revenue of $1.8 billion in 2016, down four percent year over year, ATOI of $176 million, up six percent year over year, adjusted EBITDA of $291 million, up seven percent year over year, and an adjusted EBITDA margin of 16.1 percent.” It further highlighted that Arconic was deriving 10% of its sales from the building and construction industries, and a full 6% of its revenues from the U.K., the only other country than the U.S. whose sales were so significant to Arconic that they were individually broken-out.

197.    In a section entitled “Living Our Values,” the 2016 Annual Highlights Report emphasized that Arconic “excel[s] as high-performance teams – safely, with respect and integrity.” The section next emphasized “Safety”, representing that ***“[n]othing matters more than human life***,” and that this had “long been a guiding principle at Arconic, and ***safety [was] one of [its] most cherished values***.”

198.    The Company also represented the following with respect to its Ethics and Compliance Program:

> Our Ethics and Compliance Program drives a global culture of . . . ***compliance, prevention and risk identification and mitigation*** . . . .

199.    On or around March 8, 2017, the Company made the following representations on its official website regarding the use of its architectural products in buildings:

> Fire is a key issue when it comes to buildings.

When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly.

Important to take the "fire characteristic" into account when starting the construction or refurbishment of a building in order to protect the people and assets while limiting fire propagation.  It is especially crucial for public establishments such as hospitals, schools, offices, etc.

Buildings are also classified according to their height and destination (public buildings, industrial building, housings…): it will also define which materials are safer to use. Another important rule when it comes to the height of buildings concerns the accessibility of the fire brigade to the fire in the building: as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material.



As soon as the building is higher than the firefighters' ladders,
it has to be conceived with an incombustible material.

200.    On or about April 25, 2017, Arconic issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2017 ("Q1 2017").  For Q1 2017, the press release reported that Arconic's Transportation and Construction Solutions segment had generated third-party sales of $449 million and adjusted earnings before interest, tax, depreciation and amortization ("Adjusted EBITDA," which in Q1 2017 replaced ATOI as Arconic's primary measure of segment performance) of $72 million.

201.    On or about May 2, 2017, Arconic filed its Form 10-Q for the quarter ended March 31, 2017 with the SEC ("Q1 2017 10-Q").  The Q1 2017 10-Q was signed on behalf of Arconic by its CFO and its Controller. Also, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002,

Arconic's Interim Chief Executive Officer David Hess certified that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

202.    The Q1 2017 10-Q set forth financial results substantially similar to those described above regarding Arconic's April 25, 2017 press release.

203.    Defendants' statements made in 2017, which specifically discuss the features of the Reynobond ACM products, including Reynobond PE, were false and misleading because at the time these statements were made, Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard.

204.    Defendants' statements made in 2017 related to the Company's procedures and practices concerning safety, compliance, risk identification and mitigation were false and misleading because at the time these statements were made, (i) Arconic did not employ safety procedures to cover its contractors and product safety, but instead supplied highly flammable Reynobond PE products in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard; and (ii ) Arconic's assurances of safety practices concealed from investors the immense risk Arconic had assumed through its marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries.

205.    Defendants' statements made in 2017 representing that Arconic has adopted appropriate risk management and compliance programs that address and reduce the risks associated with legal compliance risks related to product liability, safety, or noncompliance with US

and foreign sale sales and trading practices were false and misleading because, at the time these statements were made, Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was non-compliant, unsafe and presented a fire hazard, exposing Arconic to hundreds of millions of dollars in potential civil and criminal liability.

206.    Defendants' statements made in 2017 concerning sales metrics (*i.e.*, that the Company made millions of dollars in revenues and profits from, among other products, sales of Reynobond PE products) were false and misleading because Defendants failed to disclose that Reynobond PE sales proceeds were the result of misleading and illicit marketing and sales practices, and subjected the Company to significant civil, regulatory, and criminal liability.

207.    Defendants' statements made in 2017 concerning the use of its architectural products in buildings, including the representations related to the fact that "fire is a key issue when it comes to buildings," were false and misleading because, at the time these statements were made, Defendants failed to disclose that Arconic was selling Reynobond PE for use in construction projects, where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard, directly contradicting the Company's representations.

### The Truth is Revealed

208.    On June 24, 2017, *The New York Times* published an article entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety," describing the causes of the Grenfell Tower fire and attributing the rapid spread of the fire to the highly flammable Reynobond PE cladding panels manufactured by Arconic. The article stated, in relevant part:

> The incineration of Grenfell Tower on June 14, the deadliest fire in Britain in more than a century, is now a national tragedy. The London police on Friday blamed flammable materials used in the facade for the spread of the blaze and said the investigation could bring charges of manslaughter. Hundreds of families were

53

evacuated from five high-rises that posed similar risks.

Flames consumed the tower so quickly that arriving firefighters wondered if they could even get inside. People trapped on the higher floors screamed for their lives through broken windows. At least 79 people died, a toll that is expected to rise as more bodies are recovered. Survivors have charged that the facade was installed to beautify their housing project for the benefit of wealthy neighbors.

*     *     *

The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene.  It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.

Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere.  In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes."

Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.

*     *     *

When the refrigerator on the fourth floor burst into flames, the fire ignited the flammable cladding and shot up the side of the building. The London police confirmed that on Friday and identified the refrigerator brand as Hotpoint. But experts who saw footage of the blaze had known the culprit at once. "You can tell immediately it's the cladding," said Glenn Corbett, an associate professor of fire science at John Jay College of Criminal Justice in New York.

*     *     *

[S]ubcontractor, Omnis Exteriors, said on Friday that it had not been told that the flammable Reynobond cladding was going to be combined with flammable interior insulation.  That was a problem, the firm said in a statement, adding that the cladding "should only be used in conjunction with a noncombustible material."

The cladding itself was produced by Arconic, an industry titan whose chief executive recently stepped down after an unusual public battle with an activist shareholder. Arconic sells a flammable polyethylene version of its Reynobond cladding and a more expensive, fire-resistant version.

In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10

meters, or about 33 feet, consistent with regulations in the United States and elsewhere. "Fire is a key issue when it comes to buildings," the brochure explains. "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

A diagram shows flames leaping up the side of a building.  "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

But the marketing materials on Arconic's British website are opaque on the issue.

"Q: When do I need Fire Retardant (FR) versus Polyethylene (PR) Reynobond?  The answer to this, in part, depends on local building codes. Please contact your Area Sales Manager for more information," reads a question-and-answer section.

For more than a week after the fire, Arconic declined repeated requests for comment. Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

209.    On that same day, *Reuters* published an article entitled "Arconic knowingly supplied flammable panels for use in tower: emails," revealing that Arconic sales managers were aware that flammable panels would be distributed for use at Grenfell Tower.  The article stated, in relevant part:

LONDON (Reuters) - *Six emails sent by and to an Arconic Inc (ARNC.N) sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings*. The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.

*When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations.*

The company manufactures three main types of Reynobond panel-- one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.

Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 meters in height.  Panels with a fire resistant core -- the FR model -- can be used up to 30 meters, while above that height, panels with the non-combustible core -- the A2 model -- should be used, the brochure says.

Grenfell Tower is more than 60 meters tall.

The brochure also issued a blunt warning that cladding can be a fire risk.

"When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.

"As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material." Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminum-covered panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures.

In the end, Arconic said on Friday, the company provided PE panels. "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts," the company said in an emailed statement in response to the Reuters enquiry.

*       *       *

French did not respond to requests for comment.

Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height. They do, however, refer to "Grenfell Tower" and mention other high rise projects where paneling has been used when discussing the appearance that was being sought for Grenfell Tower.

***Arconic also knew the quantity of panels being supplied and thus the total exterior coverage. A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process***.

Omnis Exteriors, which cut the Arconic tiles to shape and supplied them to the cladding contractor, said it was not responsible for the choice of panel.

"CEP played no part in the selection of Reynobond PE and simply fulfilled the order as directed by the design and build team," the company said in a statement on Saturday, referring to CEP Architectural Facades Ltd, the Omnis unit which fulfilled the contract.

*       *       *

In the emails, French and representatives of Harley and Rydon also discuss the choice of panel models and colors and how they were inching towards securing the contract with the local authority.

Harris did not respond to requests for comment.

On Sunday, **British finance minister Philip Hammond said the type of panels used, which are cheaper than non-combustible panels, were banned for use in high rise buildings in Britain, as they are in Europe and the United States.**

\*     \*     \*

The fatal fire was started by a faulty Hotpoint fridge-freezer in one of the apartments, London police said on Friday. Detective Superintendent Fiona McCormack said insulation on the building, and the **cladding panels, had failed safety tests carried out after the disaster**.

**The police investigation was considering the possibility of manslaughter and criminal offences in respect of the fire.**

210.    Detective Superintendent Fiona McCormack said insulation on the building, and the cladding panels, had failed safety tests carried out after the disaster.  Experts who saw footage of the blaze were quick to blame the cladding: "You can tell immediately it's the cladding," said Glenn Corbett, an associate professor of fire science at John Jay College of Criminal Justice in New York.

211.    Following these news reports, the price of the Preferred Shares plummeted when trading resumed on Monday, June 26th, 2017, trading down as low as $36.50 per share in intraday trading, down nearly $4 per share, or 9.5% from their close of $40.11 on the evening of Friday, June 23rd, 2017, on unusually high volume of more than 1.4 million shares trading.

212.    On June 26, 2017, Arconic effectively conceded the unfitness of this cladding product for Grenfell Tower and for high-rise projects generally. According to The Guardian, Arconic sent an email to clients notifying them that it would no longer sell Reynobond PE for use in high-rise buildings. Arconic attributed this decision to "inconsistency of building codes across the world":[2]

The company that manufactures an element of the cladding believed to have

---

[2] *The Guardian*, "Grenfell Tower: cladding material linked to fire pulled from sale worldwide," June 26, 2017, 11:11 EDT.

contributed to the rapid spread of fire through Grenfell Tower has pulled the material from sale around the world.

Arconic said on Monday that it was discontinuing Reynobond PE, panels that are combined with insulation to form cladding that was revealed as flammable in the wake of the blaze that killed at least 79 people in west London.

The firm said it had stopped global sales of the material for tall buildings over concerns about the "inconsistency of building codes across the world."

The manufacturer said in a statement: "Arconic is discontinuing global sales of Reynobond PE for use in high-rise applications. We believe this is the right decision because of the inconsistency of building codes across the world and issues that have arisen in the wake of the Grenfell Tower tragedy regarding code compliance of cladding systems in the context of buildings' overall designs. We will continue to fully support the authorities as they investigate this tragedy."

The company emailed clients on Monday to tell them it would no longer sell Reynobond PE to buyers planning to use it on tower blocks. It said this would apply globally due to the difficulty of being sure that its material would be used in a way compliant with building regulations in multiple countries.

213.    *The Guardian* observed that Arconic's decision to cease sales of Reynobond PE as cladding for skyscrapers, followed Reuters' revelation that the Company had been aware in 2014 that Reynobond PE would be installed on Grenfell Tower despite Arconic's own warning about its use on high-rise projects.

The decision to stop selling Reynobond PE for use in skyscraper cladding comes after it emerged that the company knew that the less fire-resistant version, Reynobond PE, would be used on Grenfell Tower, despite its own guidelines warning that it was unsuitable for buildings above 10m tall. Emails obtained by Reuters showed Arconic was involved in discussions about the use of cladding on the building during 2014.[3]

214.    The revelations about Arconic's decision to sell Reynobond PE for Grenfell Tower with full knowledge of the danger posed for a high-rise building by this flammable product, and contrary to Arconic's own warnings, caused sharp declines in price of Arconic common and preferred stock.  By market close on Monday, June 26, 2017, the price of Arconic

---

[3] *Id.*

common stock had fallen 5.99% to $24.01 from its closing price of $25.54 on Friday, June 23, 2017. Also on June 26, 2017, the price of Arconic preferred stock fell 6.08% to $37.72, from $40.16 at close on June 23, 2017.

215.     In its June 26, 2017 press release issued after market close, Arconic again attempted to distance itself from responsibility for the Grenfell Tower fire. Arconic pointed to other contributors to the Grenfell Tower's cladding system, as well as to building codes and regulations or violation thereof, minimizing the role Arconic played in the tragic fire as manufacturer and supplier of Reynobond PE.

- Arconic supplied one of our products, Reynobond PE, to our customer, a fabricator, which used the product as one component of the overall cladding system on Grenfell Tower. The fabricator supplied its portion of the cladding system to the façade installer, who delivered it to the general contractor. The other parts of the cladding system, including the insulation, were supplied by other parties. We were not involved in the installation of the system, nor did we have a role in any other aspect of the building's refurbishment or original design.

- While we provided general parameters for potential usage universally, we sold our products with the expectation that they would be used in compliance with the various and different local building codes and regulations. Current regulations within the United States, Europe and the U.K. permit the use of aluminum composite material in various architectural applications, including in high-rise buildings depending on the cladding system and overall building design. Our product is one component in the overall cladding system; we don't control the overall system or its compliance.

- Nevertheless, in light of this tragedy, we have taken the decision to no longer provide this product in any high-rise applications, regardless of local codes and regulations.[4]

216.     Market discussion and analysis of disclosures about Arconic's conduct in knowingly providing a flammable cladding product for use on Grenfell Tower, and its marketing and sales practices, continued on June 27, 2017. In addition, news on June 27, 2017, indicated that law

---

[4] Business Wire, "Arconic Issues Statement on Reynobond PE," June 26, 2017, 5:47 pm EDT.

enforcement and regulatory investigation of past application of flammable cladding to high-rise buildings in the U.K., would intensify. In a Cabinet meeting on June 27, U.K. Prime Minister Theresa May called for a major national investigation specifically into use of cladding on high-rise structures, in addition to the previously announced investigation into the Grenfell Tower fire. Prime Minister May's call to the Cabinet and the public came after discovery that flammable cladding had been applied in all 95 samples amounting to 100% of the U.K. high-rises investigated to date following the Grenfell Tower fire. This was a further materialization of the risk that the liability of Arconic as manufacturer and seller of flammable cladding, extended beyond liability in the Grenfell Tower fire.

> Prime Minister Theresa May has said there must be a "major national investigation" into the use of potentially flammable cladding on high-rise towers across the country over a period of decades.

> Mrs. May's call came as Cabinet was informed 95 samples of cladding from tower blocks in 32 English local authority areas have failed fire safety tests – amounting to 100 per cent of all samples submitted by councils in the wake of the Grenfell Tower tragedy.

> The PM's official spokesman said the national investigation could be conducted as a second phase of the public inquiry already announced into the west London blaze, which claimed the lives of at least 79 people earlier this month.[5]

217.    On June 27, 2017, prices of Arconic common and preferred stock fell again as a result of the above revelations. Arconic common stock closed on June 27 at $21.84, down 9.04% from its closing price of $24.01 on June 26, 2017. Arconic preferred stock closed on June 27 at $34.55, down 8.40% from its closing price of $37.72 on June 26, 2017.

218.    On April 5, 2018, the British Broadcasting Corporation reported that, based on an investigation it conducted, "fire tests carried out as early as 2014 [by Arconic] showed cladding

---

[5] *The Telegraph*, "Grenfell fire: Theresa May pledges 'major national investigation' into cladding on high-rise buildings," June 27, 2017, 1:17 pm GMT (9:17 am ET).

used on Grenfell Tower failed to meet the safety standards originally claimed by its manufacturer

[Arconic]."[6] According to the report:

> The firm Arconic knew the test rating had been downgraded, but the UK body that certifies building products said it was not told about the change.
>
> An industry source, who has worked on a number of cladding schemes, said he believed there should have been a product recall.
>
> Arconic said it did share the rating with "various customers and certification authorities."
>
> It said the results were also published on the website of the French facility that carried out the tests in 2014 and 2015.
>
> The cladding used on Grenfell was Reynobond PE, aluminium panels containing a plastic filling, that were popular in cost-conscious council refurbishment schemes.
>
> While zinc cladding was initially considered when the tower was refurbished in 2015, Reynobond PE was a cheaper option, saving nearly £300,000.
>
> In the standard European tests for "reaction to fire", products are rated A to F - with A being the top rating. Reynobond PE had a certificate based on a rating of B.
>
> Some in the construction industry regarded this to be the required standard for use on buildings over 18m in height, though the government says this was wrong and it should have been A rated.
>
> The rating was issued in 2008 by the British Board of Agrément (BBA), which used technical data provided by the manufacturer to assess the standard of the panels.
>
> However, the BBC has uncovered a series of reports commissioned by the manufacturer in 2014 and 2015, during the planning for the Grenfell refurbishment.
>
> Two configurations of the cladding, both later to be fitted at Grenfell, were tested.
>
> One, known as "riveted", was given a classification of C, not B as was stated on the certificate.

---

[6] *See* Tom Symonds & Claire Ellison, *Grenfell Tower Cladding Failed to Meet Standard*, BBC, April 5, 2018

## Fire testing of Reynobond PE 55

| Year | Type | Test fully completed? | Classification |
|------|------|----------------------|----------------|
| 2011 | Riveted | ✓ | Ⓑ |
| 2014 | Riveted | ✓ | Ⓒ |
| 2014 | Cassette | ✗ | Ⓔ |
| 2015 | Riveted* | ✓ | Ⓒ |
| 2015 | Cassette* | ✗ | Ⓔ |

*Translucent core and black core

Source: European classification under EN13501-1 carried out by CSTB, France   BBC

Another type, the "cassette system", where the panels are formed into shapes before being fitted, was classified as E. In this case, the reports suggest the testing process was not completed.

However, the BBC also obtained Arconic correspondence sent to clients from late 2015 in which the company appears to confirm some of the panels were rated class E.

The email specifically addresses "concerns about the product's fire reaction class in the UK".

The BBC spoke to one source, who has worked on major cladding schemes, though not Grenfell.

He told us the email was not sent to his company's technical department and was only found after an intensive search of all company records following the Grenfell fire.

## Letter from the cladding makers to clients, December 2015



The source said E rated cladding would have been unacceptable in the projects he worked on.

"To be blunt," he said, "you wouldn't put E on a dog kennel".

He said he should have been informed of the classification results by Arconic with a product recall.

"We would have had to inform our client who would have had a duty of care to say this material is no longer compliant with building control or building regs and should be removed from buildings."

That will now happen, but only as a result of the Grenfell fire and the loss of 71 lives.

Fire testing is carried out regularly by companies producing building materials and, because the results are commercially sensitive, they are not made public.

Instead, manufacturers share their results with The British Board of Agrément (BBA).

After seeing the BBC's evidence the BBA said it "was not notified that there were other test results available in addition to those quoted in the BBA Certificate."

"It is a requirement of the certification process that the BBA is informed of information like this."

The inspectors who "sign off" construction projects rely on the accuracy of the BBA certificates.

Barry Turner, the technical director of Local Authority Building Control, which represents all council building control teams, said: "We are very dependent on the manufacturer telling us there has been a change to that product.

"If someone comes with a classification which doesn't meet what's indicated in the building control guidance then we would say 'that's not suitable. Go away and find another product.'"

**What are the regulations in the UK?**

Since the Grenfell Tower fire, ministers and experts have argued that buildings over 18m needed to meet a class A standard, not B.

But many in the construction industry claim the guidance for meeting the building regulations was unclear until after the fire.

In England and Wales, class B is still regarded as the required standard for some buildings of less than 18m in height which are close to other structures.

The BBC's latest findings could also result in scrutiny of buildings in Scotland where a B classification can also be used on tall buildings under certain circumstances.

**How has Arconic responded?**

Arconic told us: "We previously provided the classification results to various customers and certification authorities, and they were also posted on the CSTB's publicly available website."

The CSTB is the French facility which carried out the tests.

***If the reports were available on its website, they are not now, and the CSTB was not able to provide them.*** The BBC obtained them through other sources. [the

documents are in French, as reflected in the video accompanying the BBC article, at http://www.bbc.com/news/uk-43558186]

***We could find no mention in Arconic's marketing material of the lower classifications for the cheaper Reynobond PE cladding.***

However, the company advertises more expensive versions of its cladding that were classified A2 and B in the European tests.

Arconic also suggested the BBA certificate could not be relied on alone as a mark of fire safety.

Its statement said: "The relevant UK building codes and regulations require entities who design the cladding system, such as architects, fabricators, contractors, or building owners, to conduct their own full systems testing or analysis of the entire cladding system."

**What more do we know about the Grenfell cladding?**

The BBC can also reveal Grenfell Tower was fitted with two different versions of the Reynobond PE cladding.

Arconic changed the makeup of its product, replacing the grey translucent plastic with a black material, also plastic, during the refurbishment of the tower.

It said the change was made to ensure cladding would weather better in direct sunlight and the test results suggest the new version performed better when exposed to flames.

Yet some of the older cladding was already installed on Grenfell and other towers, and was not removed.

**What did our testing of the panels show?**

We asked plastics experts at Impact Solutions in Aberdeen to analyse the older and newer versions of the panel for the BBC.

They concluded both were made of polyethylene plastic.

However, chemical analysis suggested the original Reynobond panel had a wax ingredient, possibly added to make it easier and cheaper to form into sheets.

The Impact Solutions experts believe this substance was removed for the newer version of the cladding.

At our request, the company exposed the panels to a flame under laboratory conditions, demonstrating that the newer version burned for a slightly shorter period than the older.

But both samples caught fire within two minutes, both dropped streams of melted, flaming plastic.

Les Rose, from Impact Solutions, described the speed at which the plastic burnt as "fairly dramatic", observing that it appeared to be "feeding the flames".

He regarded neither type of cladding as adequate for fixing to tall buildings.

Since the Grenfell disaster, Arconic has withdrawn Reynobond PE from the market for all building uses.

The company is now being forced to disclose evidence to investigations by the police and the Grenfell Tower public inquiry.

219.    The Company's stock price has not recovered as a result of the wrongdoing alleged herein, with the Company's stock closing at $17.40 on June 19, 2018.

## DAMAGES TO THE COMPANY

220.    Arconic has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Arconic has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

    a.  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

    b.  substantial loss of market capital;

    c.  costs already incurred and to be incurred defending the pending securities fraud class action lawsuit pending before this Court captioned *Howard v. Arconic, Inc., et al.*, Case No. 1:117-cv-01057 (W.D. Pa.); and

    d.  any fines or other liability resulting from the Company's violations of federal law.

221.    In addition, Arconic's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.   The credibility and motives of management are now in serious doubt.

222.    The wrongdoing complained of herein has irreparably damaged Arconic's corporate image and goodwill.  For at least the foreseeable future, Arconic will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Arconic's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

223.    Plaintiff brings this action derivatively in the right and for the benefit of Arconic to redress injuries suffered, and to be suffered, by Arconic as a direct result of violations of federal securities laws by the Defendants.  Arconic is named as a Nominal Defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

224.    The Board of Arconic, at the time this action was commenced, consisted of Defendants Albaugh, Alving, Ayers, Blankenship, Collins Doty, Gupta, Hess, Mahoney, Miller, O'Neal, Plant, and Schmidt, a total of 13 individuals.

225.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Arconic Board would be futile, and therefore, excused.  This is because a majority of the Board faces a sufficiently substantial likelihood of liability as a result of their false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

### Demand is Futile as to Defendant Blankenship Because His Principal Professional Occupation is as the Company's CEO

226.     Defendant Blankenship has been the Company's CEO and director since January 2018.  In his role as CEO of the Company for the fiscal year 2018, Defendant Blankenship stands to receive (at a minimum) $1,250,000 in compensation.   The Company does not claim that Defendant Blankenship is an independent director.   Defendant Blankenship's primary source of income and primary employment is his employment as CEO of Arconic and his professional reputation is inextricably bound to his role at Arconic.   Accordingly, Defendant Blankenship is incapable of acting independently and demand is futile upon him.

**Demand is Futile as the Director Defendants
Have Demonstrated they are Committed to not Taking Meaningful Action in this Matter**

227.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Arconic Board would be futile, and therefore, excused.  This is because the present Board has demonstrated a position of indifference to this matter which shocks the conscience to the extent that it demonstrates a commitment to non-action.

228.     From almost immediately after the June 14, 2017 Grenfell Tower disaster, the Director Defendants had full knowledge that it is uncontestable fact:

(1) That high level Company managerial employees knowingly authorized the ordering and sale of Reynobond PE exterior wall building cladding (building skin) for application to the exterior walls of the entire twenty-four story Grenfell Tower, which they knew to be a fire hazard (as established by inner-corporate E-mails and documents, which have been well publicized in the international and U.S. press);

(2) Reynobond PE exterior wall building cladding has a flammable polyethylene interior (sandwiched in between two flammable aluminum sheets) which, if ignited at any location on the exterior of a building, will rapidly envelope an entire building coated in Reynobond PE exterior

wall building cladding, in flames;

(3) That the Company supplied Reynobond PE exterior wall building cladding of Grenfell Tower behaved precisely as Company documents concerning the fire hazard of the product (if installed on buildings above ten meters) indicated, converting what would have been an isolated internal containable fire, into an inferno enveloping the entire building;

(4) That because the Company's Reynobond PE exterior wall building cladding acted precisely as the Company knew it would if ignited at any single spot on the building, the Grenfell fire burned from outside-in trapping those inside the building (unlike regular building fires which burns from inside-out, allowing those inside a chance to escape); and,

(5) Eighty men, women and children were burned alive due to the fact that the Company's Reynobond PE flammable exterior wall building cladding covered Grenfell Tower.

229.    In addition to immediately halting the sale Reynobond PE exterior wall building cladding for high rises, in the face of the above stark non-debatable facts (regardless of the precise parameters of the Company's legal liability under British law), the Director Defendants – as the corporate conscience and ultimate providers of oversight[7] – had an obvious duty to immediately and thoroughly investigate the matter and take disciplinary action against all Company employees responsible.

230.    The Board has not reported, other than a vaguely described limited response to a shareholder demand at least eight months after the Grenfell tragedy, any meaningful investigatory or disciplinary action against the Company personnel who were responsible for knowingly

---

[7] The Company's Corporate Governance Guidelines note that "[t]he ***Board oversees and provides guidance*** to management on Company issues related to corporate social responsibility and sustainability, and environmental, health ***and safety matters***."

supplying flammable panels for use on the Grenfell Tower.

231.    The Board's first reported action responsive to the Grenfell Tower fire was reported in the Company's 2018 Form 10K, filed on February 26, 2018, eight months after the Grenfell Tower fire, in which the Board reported only that,

> The Board of Directors has also received letters, purportedly sent on behalf of shareholders, reciting allegations similar to those made in the federal court lawsuits and demanding that the Board authorize the Company to initiate litigation against members of management, the Board and others. The Board of Directors has appointed a Special Litigation Committee to review these shareholder demand letters and is considering the appropriate course of action.

232.    Though Board inaction (be it investigatory, disciplinary or legal action) is normally not an indication that the Board is committed to inaction, here where the call to action is so great, the facts so clear, and the resultant loss of life so inconceivably horrific, the Board's eight months of inaction utterly shocks the conscience and is indicative of a mindset.

233.    Because there is no question that the Company intentionally sold flammable cladding for a use it knew endangered thousands of lives – and resulted in 80 agonizing deaths – the Board's failure to take any reported oversight action for eight full months until it took the feeble step of creating a demand committee in response to a shareholder demand, indicates an attitude towards this matter which puts into question the suitability of this Board to objectively evaluate a demand for action.

234.    Further, the Director Defendants had an obvious duty to halt incentive pay to such persons and take appropriate steps to preserve the ability of the Company to claw back prior payments and seek indemnification from such persons for the huge damages and costs that the Company will undoubtedly have to pay as a result.

235.    By their above described inaction, Defendants have established a reasonable doubt as to their impartiality to consider demand to take action against those responsible for the supply

of unsafe materials in the Grenfell Tower project.

## **Demand is Futile as to the Audit Committee Defendants**

236.    Demand is futile as to Defendants Albaugh, Ayers, Hess, Mahoney, and O'Neal (collectively, the "Audit Committee Defendants") as the members of the Audit Committee in their knowing failure to fulfill their responsibilities.

237.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The Audit Committee Charter notes that the purpose of the Audit Committee "to assist the Board to fulfill its oversight of the integrity of the Company's financial statements and internal controls, the Company's compliance with legal and regulatory requirements, the independent auditors' qualifications and independence, and the performance of the Company's internal audit function and independent auditors . . . ."

238.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings omitted material information concerning the safety of Reynobond PE.

239.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the safety of Reynobond PE, or lack thereof.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.   Accordingly, the Audit Committee

Defendants cannot adequately independently consider a demand.

### Additional Reason for Demand Futility

240.    Arconic's officers and directors are protected against personal liability for their acts

of mismanagement and violations of federal securities law alleged in herein by directors' and

officers' liability insurance which they caused the Company to purchase for their protection with

corporate funds, *i.e.*, monies belonging to the stockholders of Arconic.   Upon information and

belief, however, there have been certain changes in the language of directors' and officers' liability

insurance policies in the past few years and the directors' and officers' liability insurance policies

covering the Defendants in this case contain provisions that eliminate coverage for any action

brought directly by Arconic against these Defendants, known as, *inter alia*, the "insured versus

insured exclusion."   As a result, if these directors were to sue themselves or certain of the officers

of Arconic, there would be no directors' and officers' insurance protection and thus, they will not

bring such a suit.   On the other hand, such insurance coverage exists for this action, which is

brought derivatively, and will provide a basis for the Company to effectuate a recovery.   Thus,

demand on the Director Defendants is futile, and therefore, excused.

### COUNT I

**Against Defendants Kleinfeld, Collins and O'Neal for Violations of Section 14(a) of the
Securities
Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

241.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

242.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934,

provides that no proxy statement shall contain "any statement which, at the time and in the light

of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's 2016 Proxy filed violated §14(a) and Rule 14a-9 because they omitted material information regarding the danger of the Company's Reynobond PE product.

243.    The 2016 Proxy included a section entitled "Compensation Discussion and Analysis," which stated, among other things, the following regarding compensations awards based upon achievement of safety goals:

> **We Pay for Performance.** We link our executives' compensation to measured performance in key financial and nonfinancial areas. ***As noted above, performance against rigorous adjusted FCF, average annual DWC, adjusted net income, adjusted EBITDA margin, revenue growth, safety, environmental, and workplace diversity targets is measured in determining compensation.*** These metrics, coupled with the individual performance multipliers, incentivize individual, business group, and corporate performance. The Company's strategic priorities are reflected in these compensation metrics.

244.    In addition, the 2016 Proxy solicits the Company's shareholders to vote in favor of the "Re-Approval of the Material Terms of the Performance Goals under the Alcoa Inc. 162(m) Compliant Annual Cash Incentive Plan, as Amended and Restated.  Among the terms of the Cash Incentive Plan are "the achievement of sustainability measures, community engagement measures or environmental, health or safety goals of the Company or the subsidiary, division or business unit of the Company for or within which the Participant is primarily employed. . . ."

245.    The Company awarded an executive officer compensation based upon "strong performance" in the role of Executive Vice President, Human Resources and Environment, Health, Safety and Sustainability in 2015, and asked for shareholders to vote in favor of the re-approval of a plan allowing such compensation to be granted.  However, the above statements in the 2016 Proxy were false and misleading and omitted material information because they fail to disclose that, as early as 2014, the Company was aware (as further detailed below) that the Reynobond PE

products it supplied to high-rise buildings posed a serious safety risk of fire and had in fact failed to meet critical fire safety tests.

246.   Despite repeated references to consideration of safety in the proxy in various contexts, the Board effectively engaged in no material oversight of safety, other than possibly workplace safety.

247.   By omitting information regarding the danger of the Company's Reynobond PE products, shareholders voting on whether to re-approve such a plan would find such information material because the Company's knowledge of (and subsequent failure to disclose) a serious safety risk within one of its products would directly impact the issuance of compensation under said compensation plan.

248.   In the exercise of reasonable care, Defendants should have known that the 2016 Proxy contained misleading information and/or omitted material information, and were negligent in either signing or authorizing the signature thereof.

249.   The misrepresentations and omissions in the 2016 Proxy were material to Company shareholders in voting on the 2016 Proxy, and a reasonable shareholder would consider it important in deciding how to vote.

250.   Had the 2016 Proxy honestly disclosed the fact that the Board had not engaged in meaningful oversight of product safety and that the Company was knowingly selling a product for a use which it knew to create a very real danger of mass death, the shareholders would have had the opportunity to take action such that the conduct could have been addressed.

251.   The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2016 Proxy.

**COUNT II**

**Against the Officer Defendants for Breaches of Fiduciary Duty**

252.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

253.     The Officer Defendants owed and owe Arconic fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants owed and owe Arconic the highest obligation of good faith, loyalty, and due care.

254.     The Officer Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Arconic shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period, and by authorizing the sale of Reynobond PE exterior wall building cladding for high rises, with full knowledge that it was a fire hazard.  These actions could not have been a good faith exercise of prudent business judgment.

255.     During the course of the discharge of their duties, the Officer Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Officer Defendants caused Arconic to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Arconic and its shareholders.   As a result, the Officer Defendants grossly mismanaged the Company.

256.     As a direct and proximate result of the Officer Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages and will continue to sustain such damages in the form of litigation expenses, settlements, judgments, and, adverse publicity. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

257.     Plaintiff, on behalf of Arconic, has no adequate remedy at law.

## COUNT III

### Against Defendants for Abuse of Control

258.    Plaintiff incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

259.    Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Arconic and the investing public by authorizing the sale of Reynobond PE exterior wall building cladding for high rises, with full knowledge that it was a fire hazard, and by causing the Company to issue materially misleading statements and/or omitting material information concerning the safety of the Company's Reynobond PE products.

260.    As such, Defendants have abused their positions of control with the Company and are legally responsible.

261.    Thus, for the aforementioned reasons, Defendants are liable to the Company for their wrongdoing.

## COUNT IV

### Against the Officer Defendants for Gross Mismanagement

262.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

263.    The Officer Defendants engaged in gross mismanagement by authorizing the sale of Reynobond PE exterior wall building cladding for high rises, with full knowledge that it was a fire hazard.

264.    The Officer Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.   Furthermore, the Officer

Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

265.     Through the wrongful acts complained of herein, the Officer Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

266.     By committing the misconduct alleged herein, the Officer Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Arconic's affairs and in the use and preservation of Arconic's assets.

267.     During the course of the discharge of their duties, the Officer Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Officer Defendants caused Arconic to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Arconic, thus breaching their duties to the Company.

268.     As a result, the Officer Defendants grossly mismanaged Arconic and should be liable to the Company for the resulting damages

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Arconic and that Plaintiff is an adequate representative of the Company;

B.     Determining and awarding to Arconic the damages sustained by it as a result of the violations set forth above from each of the Officer Defendants, jointly and severally, together with interest thereon, including all costs, including legal fees, settlements and payment of judgments, resulting from the Grenfell Tower fire;

C.      Directing Arconic and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Arconic and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

> (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and
>
> (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.      Determining and awarding to Arconic exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.      Awarding Arconic restitution from Defendants, and each of them;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 22, 2018

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
(302) 984-3800
*Attorneys for Plaintiff*

**OF COUNSEL**
**LIFSHITZ & MILLER LLP**
Edward W. Miller
821 Franklin Ave, Suite 209
Garden City, NY 11530
Tel: (516) 493-9780
Fax: (516) 280-7376

*Attorneys for Plaintiff*